**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
OCTOBER 28, 2021

*Gonzúlez C.J.*
CHIEF JUSTICE

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 98864-1 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| LASZLO MOLNAR, | ) | |
| | ) | Filed: October 28, 2021 |
| Respondent. | ) | |
| | ) | |

YU, J. — This case concerns Laszlo Molnar's postjudgment motion for resentencing on one count of second degree rape based on the State's alleged breach of the plea agreement. The sentencing court denied Molnar's motion, and the Court of Appeals reversed. We reverse the Court of Appeals.

Molnar agreed to a contested sentencing hearing, at which he and the State agreed to make different sentencing recommendations to the court. Therefore, the State did not breach the plea agreement by filing a memorandum advocating for its own recommendation, a sentence at the middle of the standard range. The State's short memorandum made this recommendation explicitly and repeatedly, and it did

not cross the line into improperly advocating for a longer sentence. We therefore

reinstate the sentencing court's ruling denying Molnar's postjudgment motion for

resentencing.[1]

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Underlying conviction and sentence

The victim was B.A., an 83-year-old resident of Molnar's 24-hour care

facility. B.A. had "severe dementia," and she passed away before Molnar's

sentencing in this case. Clerk's Papers (CP) at 4. B.A. could not walk or talk, and

she was "unable to perform any functions of daily living to include dressing,

bathing, or feeding." *Id.* B.A. had been living at Molnar's facility for about two

and a half years when her daughter noticed that B.A. was behaving differently

during a visit. Concerned, she installed a hidden camera in B.A.'s room, which

recorded Molnar forcing his penis into B.A.'s mouth. After police confronted

Molnar with the recording, he confessed to raping B.A. approximately 10 times.

On November 18, 2014, the State charged Molnar with one count of second

degree rape with a domestic violence designation and an aggravating factor

alleging that B.A. "was particularly vulnerable or incapable of resistance." *Id.* at

---

[1] As discussed further below, Molnar's motion for resentencing was an untimely collateral attack. *See* RCW 10.73.090; CrR 7.8(b). We nevertheless reach the merits based on circumstances unique to this case, but in doing so, we strongly caution that we are *not* recognizing (or, for that matter, foreclosing) any new, expanded, or modified exception to the one-year time limit for collateral attacks.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

1-2. On August 26, 2015, the State moved to file an amended information charging Molnar with one count of second degree rape without the designation or aggravator "pursuant to Plea Negotiations with the input of the victims." *Id.* at 37. Molnar filed a statement on plea of guilty, in which he described his offense as follows: "on or about 11/13/14, in King County, WA, I engaged in sexual intercourse with B.A. B.A. was incapable of consenting because she was mentally incapacitated due to her dementia." *Id.* at 20. The parties' plea agreement included a checked box next to the statement "In accordance with RCW 9.94A.530, the parties have stipulated that the [facts set forth in the certification(s) for determination of probable cause and prosecutor's summary] are real and material facts for purposes of this sentencing." *Id.* at 27.

The court accepted Molnar's plea of guilty to second degree rape as charged in the amended information. The standard sentencing range for Molnar's offense was an indeterminate life sentence with a minimum term of 78 to 102 months' confinement. In the plea agreement, the State agreed to recommend a midrange sentence with a minimum 90-month term. Molnar's statement on plea of guilty acknowledged this recommendation but noted that it was "not agreed." *Id.* at 12.

In its four-page sentencing memorandum, the State recounted the stipulated facts and contended that a midrange, 90-month minimum sentence was "appropriate given the egregious nature of this offense and the victim's obvious

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

vulnerability." *Id.* at 56. The State's memorandum also noted that the vulnerable victim aggravator and domestic violence designation were dismissed as part of the plea agreement, and informed the court that "[h]ad this case gone to trial, the State would have added an additional sentencing aggravator of abuse of trust and an additional count of Rape in the Second Degree." *Id.* at 53-54.

In his sentencing memorandum, Molnar requested a 78-month minimum sentence at the bottom of the standard range. He emphasized that he was remorseful, that he had faced challenging circumstances as an ethnic Hungarian in Ceaușescu's Romania, and that he had worked hard to escape and to provide for his family. He included letters of support from family and friends and a certificate from a class he had completed in jail.

On October 19, 2015, the court conducted a sentencing hearing and sentenced Molnar to the top of the standard range with a minimum term of 102 months' confinement.

B. Postconviction motion for resentencing

On August 1, 2019, Molnar filed a motion for breach of plea hearing with the sentencing court. *Id.* at 57. He contended that the State's sentencing memorandum "continuously emphasize[d] aggravating sentencing factors." *Id.* at 59. As a remedy, he asked the court to "remand him for resentencing, where the State must amend the recommendation contained in their Sentencing

Memorandum." *Id.* at 60. The State did not respond, and there is no indication in the record that a response was requested.

The same judge who presided over Molnar's plea hearing and sentencing denied his motion for resentencing, ruling, "The vulnerable victim aggravator defined under RCW 9.94A.535(3)(b) and the domestic violence designation under the authority of RCW 10.99.020 were dismissed pursuant to the guilty plea entered on August 26th, 2015. The defendant pled guilty to the amended information eliminating the aggravator and domestic viol[ence] designation." *Id.* at 85. Molnar appealed, designated clerk's papers, and filed a statement indicating that he did not intend to arrange for a verbatim report of proceedings. *See* RAP 9.2(a).

The State designated one set of supplemental clerk's papers and filed a response brief on the merits, without suggesting that the record was insufficient or that there were any procedural barriers to Molnar's motion for resentencing. The Court of Appeals "[r]eversed and remanded for Molnar to elect either to withdraw his guilty plea or to enforce the plea bargaining agreement before a different judge." *State v. Molnar*, No. 80461-8-I, slip op. at 6 (Wash. Ct. App. June 1, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/804618.pdf.

The State filed a motion for reconsideration and a motion for leave to supplement the record with new materials. According to the State, it was Molnar's duty to arrange for these new materials to be filed and because he did not do so, the

*State v. Molnar*, No. 98864-1

Court of Appeals "should have required supplementation of the record or declined to address the issue" sua sponte. Mot. for Leave To File Late Verbatim Report of Proceedings & Suppl. Clerk's Papers, *State v. Molnar*, No. 80461-8-I, at 2 (Wash. Ct. App. Jun. 18, 2020). The State acknowledged that it could have filed the materials itself and did not do so but, nevertheless, argued that the materials were "plainly necessary" to decide the case fairly. *Id.* at 3. The Court of Appeals denied both of the State's motions.

We granted the State's petition for review and appointed counsel for Molnar. We accepted for filing an amicus brief by the Washington Association of Prosecuting Attorneys (WAPA) to which neither party filed a response.

ISSUE

Did the State's sentencing memorandum undercut its recommendation for a sentence at the middle of the standard range, thereby breaching the plea agreement?

ANALYSIS

This case presents an opportunity to reiterate and clarify certain well-established principles relating to collateral attacks, plea agreements, and appellate review. Ultimately, we conclude that the sentencing court's decision denying Molnar's motion for resentencing was correct on the merits but procedurally improper. On appeal, the Court of Appeals correctly relied on the record presented

6

by the parties, but it erred on the merits. No party has briefed any other issue. Therefore, we reinstate the sentencing court's ruling denying relief on Molnar's postjudgment motion for resentencing.

A.      A collateral attack on a criminal judgment and sentencing is subject to specific procedural rules, which were not properly raised or applied here

Before turning to the arguments briefed by the parties, we must address the issues raised by WAPA in its amicus brief. As WAPA correctly points out, Molnar's motion for resentencing was a collateral attack on his judgment and sentence. Neither the courts nor the parties appear to have recognized the implications of this procedural posture. We therefore take this opportunity to briefly set forth the process that usually applies to consideration of collateral attacks, including postjudgment motions for resentencing based on the State's alleged breach of a plea agreement.

Generally speaking, a person seeking to challenge their conviction or sentence has 30 days in which to initiate a direct appeal. RAP 5.2(a). "[A]ny form of postconviction relief other than a direct appeal" is known as a "'collateral attack.'" RCW 10.73.090(2); *see In re Pers. Restraint of Garcia-Mendoza*, 196 Wn.2d 836, 841, 479 P.3d 674 (2021). Most collateral attacks must be brought within "one year after the judgment becomes final if the judgment and sentence is valid on its face and was rendered by a court of competent jurisdiction." RCW 10.73.090(1). "A year after th[e] judgment is final, the statutory grounds for relief

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

that may be raised are limited. In keeping with the importance of the

[constitutional] writ [of habeas corpus], the one-year time limit is subject to

equitable tolling in extraordinary circumstances." *In re Pers. Restraint of Fowler*,

197 Wn.2d 46, 49, 479 P.3d 1164 (2021) (citations omitted). The same time

constraints apply whether the collateral attack is filed in superior court, the Court

of Appeals, or this court. CrR 7.8(b); RAP 16.4(d).

Collateral attacks filed in superior court are governed by CrR 7.8, and "when

a superior court receives a CrR 7.8 motion, it should follow the CrR 7.8(c)

procedures." *State v. Waller*, 197 Wn.2d 218, 220, 481 P.3d 515 (2021). CrR

7.8(c)(2) provides,

> The court shall transfer a motion filed by a defendant to the Court of
> Appeals for consideration as a personal restraint petition unless the
> court determines that the motion is not barred by RCW 10.73.090 and
> either (i) the defendant has made a substantial showing that he or she
> is entitled to relief or (ii) resolution of the motion will require a
> factual hearing.

Therefore, if the superior court determines that the collateral attack is untimely,

then the court must transfer it to the Court of Appeals without reaching the merits.

If for any reason the superior court does *not* transfer the collateral attack to the

Court of Appeals, then the superior court "shall enter an order fixing a time and

place for hearing and directing the adverse party to appear and show cause why the

relief asked for should not be granted." CrR 7.8(c)(3). It is only after the adverse

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

party has responded to this order to show cause that a superior court may decide whether to grant or deny relief on a collateral attack.

Molnar's motion for resentencing was clearly a collateral attack, not a direct appeal, because it was filed nearly four years after his judgment and sentence became "final" in October 2015. *See* RCW 10.73.090(3)(a). Molnar did not assert that any statutory exception to the one-year time limit applied, and none of the exceptions do. *See* RCW 10.73.100. Molnar also did not contend that equitable tolling would be appropriate, and it is not. *See Fowler*, 197 Wn.2d at 54 ("A petitioner seeking equitable tolling bears the burden of showing (1) that they diligently pursued their rights and (2) that an extraordinary circumstance prevented a timely filing."). Thus, Molnar's motion for resentencing is an untimely collateral attack that should have been transferred to the Court of Appeals for consideration as a personal restraint petition. CrR 7.8(c)(2). On receiving the transfer, the Court of Appeals presumably would have conducted a preliminary review, determined that Molnar's motion was "clearly barred" as untimely, and dismissed it "without requesting a response." RAP 16.8.1(b). That would have been the correct decision.

However, the sentencing court did not transfer or dismiss Molnar's motion as untimely. Instead, it denied the motion because Molnar received precisely what he bargained for—a standard-range sentence on a single conviction without any

9

aggravating factors or domestic violence designation.  This decision was procedurally erroneous, but in most cases error correction is a routine component of direct appeals.  In this case, Molnar's appeal only compounded the error.

The State's appellate response brief addressed only the merits of Molnar's motion for resentencing without suggesting that timeliness might be an issue.  In its opinion, the Court of Appeals did not sua sponte raise the requirement that collateral attacks like Molnar's motion for resentencing must be timely filed.  In its motion for reconsideration, the State explicitly noted that "Molnar did not assert the State breached the plea agreement for *nearly four years* after sentencing," but the State still did not contend that the underlying motion was untimely.  Mot. for Recons., *State v. Molnar*, No. 80461-8-I, at 15 (Wash. Ct. App. Jun. 18, 2020). The State's petition for review to this court did not raise timeliness as an issue, and we did not raise it ourselves when we granted review.  No one recognized that timeliness was an issue here until WAPA filed its amicus brief.  The question for this court is what we should do now.

The parties have not provided any briefing on the untimeliness of Molnar's motion or the potential consequences of that untimeliness, given the case's current

*State v. Molnar*, No. 98864-1

procedural posture.[2]  In fact, the parties did not file answers to WAPA's amicus

brief at all.

Thus, this court learned for the first time at oral argument that the State

believes Molnar's motion "is not properly before" the court because "as an

untimely collateral attack, it must be dismissed."  Wash. Supreme Court oral

argument, *State v. Molnar,* No. 98864-1 (June 10, 2021), at 4 min., 14 sec., *video

recording by* TVW, Washington State's Public Affairs Network,

http://www.tvw.org.  In the State's view, RCW 10.73.090 "deprives this court of

authority, I think, to consider the case any further."  *Id.* at 12 min., 52 sec.

However, counsel admitted that she was "not going to be able to elaborate very

far" as to the jurisdictional nature of the statute.  *Id.* at 14 min., 24 sec.

We also learned for the first time at oral argument that Molnar's appointed

counsel believes that because Molnar's "guilty plea rests on a false premise," it is

facially invalid and the "one-year time limit should give way to the defendant's

---

[2] In a footnote, WAPA asserts that we should "find Mr. Molnar's motion untimely" because "'[t]his court may affirm a lower court's ruling on any ground adequately supported in the record.'"  Br. of Amicus Curiae WAPA at 5 n.3 (quoting *State v. Costich*, 152 Wn.2d 463, 477, 98 P.3d 795 (2004)).  However, WAPA primarily focuses on its contention that Molnar is not entitled to relief because he has not made a threshold showing of prejudice.  We decline to reach that issue.  However, this court has granted relief on a timely collateral attack in a different breach-of-plea case without requiring a threshold showing of prejudice.  *State v. MacDonald*, 183 Wn.2d 1, 7-8, 21, 346 P.3d 748 (2015); *see also State v. MacDonald*, No. 69415-4-I, slip op. at 4 (Wash. Ct. App. Jan. 21, 2014) (unpublished), https://www.courts.wa.gov/opinions/pdf/694154.pdf (noting that the claim was brought in "a CrR 7.8 motion to withdraw his guilty plea").  In that regard, our decision was consistent with precedent.  *In re Pers. Restraint of James*, 96 Wn.2d 847, 851-52, 640 P.2d 18 (1982).

11

*State v. Molnar*, No. 98864-1

due process rights." *Id.* at 26 min., 57 sec. However, counsel admitted that he was unfamiliar with the relevant statutes and "did not review" them because he "did not see that as being an issue here." *Id.* at 27 min., 56 sec.

The procedural and substantive missteps that have been made in this case present unique circumstances for this court. If the Court of Appeals had reached the correct decision on the merits, we might have dismissed review as improvidently granted. But the Court of Appeals erred on the merits, and its opinion indicates a misunderstanding of the analysis that applies where an individual claims that the State breached a plea agreement by undercutting its own recommendation. Moreover, we have no briefing whatsoever from either party as to what this court may, must, or should do in light of the untimeliness of Molnar's motion for resentencing. *See* RAP 10.3(a)(6); *State v. James-Buhl*, 190 Wn.2d 470, 478 n.4, 415 P.3d 234 (2018).

Therefore, based on the exceptional circumstances of this particular case, we decline to reverse the Court of Appeals on the basis that Molnar's motion for resentencing is an untimely collateral attack. Instead, we reverse on the merits. However, we strongly caution that the circumstances presented are unique to this case, and we are neither recognizing (nor necessarily foreclosing) any new, expanded, or modified exception to the statutory one-year time limit for collateral attacks. We do not hold that any of the considerations noted here, either alone or

12

in concert, signal that the one-year time limit is in some way inapplicable to this or any other collateral attack.

B.     The State did not breach the plea agreement

Turning to the merits, certain well-established principles apply where the State allegedly breached the plea agreement.  "A plea agreement is a contract between the State and the defendant." *State v. MacDonald*, 183 Wn.2d 1, 8, 346 P.3d 748 (2015).  In every case, the State has a "good faith obligation to effectuate the plea agreement." *State v. Sledge*, 133 Wn.2d 828, 840, 947 P.2d 1199 (1997).

Therefore, if the State agreed to recommend a standard-range sentence, it may not "undercut[ ] the plea agreement by emphasizing facts generally considered only in imposing an exceptional sentence."[3] *State v. Monroe*, 126 Wn. App. 435, 440, 109 P.3d 449 (2005) (plurality opinion), *modified on remand*, 135 Wn. App. 880, 882-83, 885, 146 P.3d 931 (2006) (citing *State v. Clarke*, 156 Wn.2d 880, 134 P.3d 188 (2006)).  To determine whether the State complied with its duty of good faith, "we must 'review [the] prosecutor's actions and comments objectively from the sentencing record as a whole to determine whether the plea agreement was breached.'" *State v. Ramos*, 187 Wn.2d 420, 433, 387 P.3d 650 (2017) (alteration

---

[3] Molnar is correct that although many of the cases addressing this issue predate *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), they are still good law because "[b]efore and after *Blakely*, a prosecutor breaches a plea agreement by directly, indirectly or through an agent, arguing in support of a higher sentence than agreed to in the plea agreement."  Suppl. Br. at 8 (citing *MacDonald*, 183 Wn.2d 1).

13

*State v. Molnar*, No. 98864-1

in original) (quoting *State v. Carreno-Maldonado*, 135 Wn. App. 77, 83, 143 P.3d

343 (2006)).

In general, a "trial court's order on a motion to withdraw a guilty plea or

vacate a judgment is reviewed for abuse of discretion." *State v. Lamb*, 175 Wn.2d

121, 127, 285 P.3d 27 (2012). However, on the particular question of whether the

State breached Molnar's unambiguous plea agreement, "our review is de novo."

*Ramos*, 187 Wn.2d at 433.

In this case, the State's sentencing memorandum explicitly stated multiple

times that the State recommended a 90-month sentence at the middle of the

standard range. However, Molnar contends that the State breached the plea

agreement by filing an "[u]nsolicited" sentencing memorandum, which he argues

undercut its midrange sentencing recommendation by "highlight[ing]" aggravating

factors that were not supposed to be at issue. Suppl. Br. at 2. These contentions do

not adequately account for the context presented, which is essential to the fact-

specific inquiry required in this type of case.

1.     The State's sentencing memorandum was not "unsolicited"

Initially, Molnar appears to contend that the State breached the plea

agreement by filing a sentencing memorandum at all. He points to cases in which

the State breached a plea agreement by "offer[ing] unsolicited factors in support of

an aggravating factor not mentioned in a presentence report previously presented to

14

the court." *Id.* at 7-8 (citing *MacDonald*, 183 Wn.2d at 8-9; *State v. Talley*, 134 Wn.2d 176, 186, 949 P.2d 358 (1998); *Sledge*, 133 Wn.2d at 842-43; *Carreno-Maldonado*, 135 Wn. App. at 83-84; *State v. Van Buren*, 101 Wn. App. 206, 216, 2 P.3d 991 (2000); *State v. Jerde*, 93 Wn. App. 774, 782, 970 P.2d 781 (1999)). He contends that the State similarly breached the plea agreement here by filing a sentencing memorandum that was "[u]nsolicited." *Id.* at 2.

However, all of the cases that Molnar relies on are distinguishable. In the cited cases, the State purported to speak on behalf of the victims, *MacDonald*, 183 Wn.2d at 6-7; *Carreno-Maldonado*, 135 Wn. App. at 80-81; elicited testimony supporting a sentence above the State's recommendation with "fervor," *Sledge*, 133 Wn.2d at 842; "volunteered" to argue for a sentence above the State's recommendation, *Van Buren*, 101 Wn. App. at 209; or actually did argue for a sentence above the State's recommendation, *Jerde*, 93 Wn. App. at 782, all without being asked to do so.[4]

The Court of Appeals cited two additional cases in support of Molnar's position. *See Molnar*, No. 80461-8-I, slip op. at 4. Both involve the State improperly undercutting its standard-range sentence recommendation, but, again, they are materially distinguishable. In *State v. Xaviar*, the State noted possible aggravators even though it agreed to recommend a sentence at the *bottom* of the

---

[4] In one of the cases, we held that there was not a breach. *Talley*, 134 Wn.2d at 186, 188.

*State v. Molnar*, No. 98864-1

standard range. 117 Wn. App. 196, 198, 200-01, 69 P.3d 901 (2003). And in *State v. Williams*, the State set forth multiple potential aggravators and argued that its recommendation for the *top* of the standard range was really the "'minimum'" sentence that would be appropriate. 103 Wn. App. 231, 238, 11 P.3d 878 (2000).

In this case, by contrast, the State filed a short memorandum in support of its midrange sentence recommendation prior to Molnar's mandatory sentencing hearing. *See* RCW 9.94A.500(1). The mere act of filing such a memorandum cannot be a breach of the plea agreement. "If we were to conclude otherwise, the sentencing court would be faced with a one-sided hearing, a circumstance that would not promote the ends of justice." *Talley*, 134 Wn.2d at 186.

Molnar suggests that the parties' differing recommendations are irrelevant because the State's sentencing memorandum "was filed prior to the defense memorandum." Resp. at 1 (boldface omitted). Molnar is correct to the extent that his sentencing memorandum was filed 42 minutes after the State's. However, he is mistaken about the importance of that fact.

Setting aside that the memoranda were filed almost simultaneously, when the State had moved to amend the information almost two months prior, it did so "pursuant to Plea Negotiations." CP at 37. It is difficult to believe that the State would not have known from plea negotiations that Molnar would dispute the State's sentencing recommendation. And Molnar's statement on plea of guilty

16

confirmed that the State's recommendation was "not agreed." *Id.* at 12. Thus, although the State's memorandum was filed first, the record clearly shows that both parties already knew Molnar would request a lower sentence than the State had agreed to recommend.

Considered in this context, the State's sentencing memorandum cannot be deemed "unsolicited."

2. The language of the State's memorandum did not undercut its midrange sentencing recommendation

Molnar also challenges the language of the State's sentencing memorandum, which he asserts "highlighted the dismissed aggravating [factor] in a transparent attempt to obtain a harsher than agreed upon sentence, a practice expressly condemned by the cases cited herein." Suppl. Br. at 10. The Court of Appeals agreed, holding that "numerous cases" support Molnar's view. *Molnar*, No. 80461-8-I, slip op. at 5. "But the first rule of case law as well as statutory interpretation is: Read on." *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 36, 133 S. Ct. 511, 184 L. Ed. 2d 417 (2012).

All of the cases Molnar and the Court of Appeals rely on are distinguishable, as noted above. This is neither surprising nor fatal to Molnar's claim, given the fact-specific nature of our inquiry. But we must consider the language of the State's sentencing memorandum in the specific context presented here rather than attempt to apply broad generalizations drawn from other cases.

17

*State v. Molnar*, No. 98864-1

> a. The State properly summarized the original charges and the plea negotiations

Molnar first suggests that it was improper for the State's memorandum to include a summary of the original charges and the plea negotiations. However, the sentencing court needed some background information to provide context for the parties' competing recommendations. And to support its own midrange recommendation, the State "necessarily included facts sufficient to justify the court" in following it. *Monroe*, 126 Wn. App. at 440. Thus, the background summary in the State's sentencing memorandum was appropriate, and it proved necessary because Molnar's memorandum did not include any similar information.

In addition, it appears that Molnar does *not* object to the State's assertion that it would have filed an additional rape charge if the case went to trial. This may indicate that the theory underlying Molnar's claim is that if the State agrees to recommend a standard-range sentence, then it automatically breaches the plea agreement if it mentions any aggravating factor except in response to a direct question by the court. *Cf. Molnar*, No. 80461-8-I, slip op. at 4 ("A breach occurs when the prosecutor offers unsolicited information that supports an exceptional sentence."). We now clarify that such an expansive reading of case law is inappropriate in the context-specific inquiry required here.

18

        b.       The words Molnar points to from the State's memorandum do not establish a breach of the plea agreement

Molnar also notes that in making its sentencing recommendation, the State used words such as "'egregious,'" "'vulnerability,'" and "'trust relationship.'" Suppl. Br. at 3 (boldface omitted) (quoting CP at 56). He claims the use of these words "crossed the line from objectively reporting the facts to ensure a mid-range sentence to outright advocacy for a higher sentence." *Id.* at 11. However, in a breach-of-plea case, the State's words must always be considered in context, and a key piece of the context here is that Molnar bargained for a disputed sentence. The State was therefore entitled to advocate for its own recommendation, and it did not exceed appropriate prosecutorial boundaries in doing so.

First, the portion of the State's memorandum that Molnar points to does not purport to be "objectively reporting the facts." *Id.* Instead, it explicitly and properly advocates for "[i]mposition of a minimum term of 90 months, the middle of the standard range," as the State had agreed to recommend. CP at 56. To the extent Molnar believes that the State's advocacy may not use words that are not used in "[t]he real facts in the certificate of probable cause," he is mistaken. Suppl. Br. at 3. The State must be allowed to use descriptive words in addition to stipulated facts because, while the State's "recommendation need not be made 'enthusiastically,'" it need not be made so *un*enthusiastically that it is unhelpful to

19

*State v. Molnar*, No. 98864-1

the sentencing court. *Sledge*, 133 Wn.2d at 840 (quoting *State v. Coppin*, 57 Wn. App. 866, 874, 791 P.2d 228 (1990)); *see also Talley*, 134 Wn.2d at 186.

Second, to the extent that Molnar objects to the State's use of words like "egregious," the basis for this objection is unclear. The aggravating factors at issue in this case do not use the word "egregious." *See* RCW 9.94A.535(3)(b), (n). And while the court in *Xaviar* condemned the State's "commenting at [the] sentencing hearing about the *egregious* nature of the crime," that does not make "egregious" an inappropriate word in all cases. 117 Wn. App. at 198 (emphasis added). As noted above, in *Xaviar* the State agreed to recommend a sentence at the *bottom* of the standard range, so the egregiousness of the crime was not relevant to the State's recommended sentence. *Id.* Here, the State opposed Molnar's request for a low-end sentence, so the egregiousness of the offense was highly relevant. To the extent that Molnar simply objects to the characterization of his offense as "egregious," this objection does not establish a breach of the plea agreement. It cannot be said that "egregious" is an objectively inaccurate word to characterize the stipulated facts here, and the State "was not muted simply because [Molnar]'s crimes arouse natural indignation." *Monroe*, 126 Wn. App. at 440.

Finally, Molnar points to words from the State's memorandum that *do* appear in the aggravating factors at issue in this case, such as "vulnerable" and "trust." *See* CP at 56; RCW 9.94A.535(3)(b), (n). This argument best illustrates

*State v. Molnar*, No. 98864-1

the need to consider the State's alleged breach in the particular context presented. The State here needed to simultaneously oppose Molnar's request for a low-end sentence and avoid advocating for a high-end sentence. In order to do that, the State argued that a low-end sentence was inappropriate based on B.A.'s incapacity and her resulting dependence on caregivers such as Molnar. The factual basis for this argument was set forth in the certification of probable cause and was further acknowledged in Molnar's statement on plea of guilty. The State did not improperly advocate for an exceptional sentence by highlighting B.A.'s incapacity because that incapacity rendered her "incapable of consent," which was necessary to Molnar's second degree rape conviction. RCW 9A.44.050(1)(b); *see State v. Thomas*, 138 Wn.2d 630, 636, 980 P.2d 1275 (1999) ("[A]n exceptional sentence may not be based on factors inherent to the offense for which a defendant is convicted.").

We do disapprove the State's using words like "vulnerability" and "trust relationship." CP at 56. There are surely other words that would suffice and do not echo statutory aggravating factors. *See* RCW 9.94A.535(3)(b), (n). Nevertheless, the State's questionable wording choices could have been wholly remedied by replacing isolated words with synonyms. The substance of the State's argument was entirely proper because "sometimes it *is necessary* for the State to point out potentially aggravating facts, even when bound to recommend a

21

*State v. Molnar*, No. 98864-1

standard-range sentence." Suppl. Br. of Pet'r at 6; *see, e.g.*, *Monroe*, 126 Wn.

App. at 440; *Coppin*, 57 Wn. App. at 875.

We therefore reverse the Court of Appeals and reinstate the sentencing

court's ruling on the merits. The State's sentencing memorandum did not breach

the plea agreement.

C.     The Court of Appeals did not abuse its discretion in denying the State's
       postopinion motions

The State also challenges the Court of Appeals's "denial of the State's

motion for reconsideration and motion for leave to file late verbatim report of

proceedings and supplemental clerk's papers." Pet. for Review at 1. Although we

reverse on the merits, we hold that the Court of Appeals properly exercised its

discretion in denying the State's motion to supplement the record on

reconsideration.

The State contends that in every case "when the defendant claims a breach

with respect to the State's sentencing recommendation," the defendant must

arrange to file the underlying sentencing transcript. Suppl. Br. of Pet'r at 14.

Molnar did not do so here, and the State argues that "the Court of Appeals has only

'two choices' when faced with such a material omission in the record: 'It could

have required supplementation of the deficient record, pursuant to RAP 9.10, or it

could have declined to consider the . . . issue.'" *Id.* at 16 (alteration in original)

(quoting *State v. Wade*, 138 Wn.2d 460, 465, 979 P.2d 850 (1999) (per curiam),

22

and citing *State v. Sisouvanh*, 175 Wn.2d 607, 619, 290 P.3d 942 (2012)). This contention misrepresents our precedent and proposes an inappropriately broad rule that does not allow appellate courts to consider the context of each case.

In *Wade*, we held that "the Court of Appeals erred by reversing the trial court's admission of evidence under ER 404(b), where the appellate court did not have before it the report of proceedings" and the trial court had issued an oral ruling. 138 Wn.2d at 461. We also disapproved of the Court of Appeals's choosing "to infer the trial court's analysis 'from the silent record,'" rather than request supplementation. *Id.* at 465 (quoting *State v. Wade*, 92 Wn. App. 885, 893, 966 P.2d 384 (1998)). In *Sisouvanh*, the appellate record was "sufficient to affirm the trial court's decision," even though the issue was the adequacy of a defendant's competency evaluation and the evaluation itself was not in the record. 175 Wn.2d at 618. Thus, contrary to the State's characterization, neither case obviously establishes that the Court of Appeals in this case had no choice but to either dismiss Molnar's appeal or require him to supplement the record.

There are procedures for parties to file materials before an appellate court issues its opinion, but not after. *See* RAP 9.2, 9.6, 9.10. The State urged the Court of Appeals to rely on RAP 1.2(a) and (c), which provide that the Rules of Appellate Procedure "will be liberally interpreted to promote justice" and that "[t]he appellate court *may* waive or alter the provisions of any of these rules in

*State v. Molnar*, No. 98864-1

order to serve the ends of justice." (Emphasis added.) The Court of Appeals thus had discretion in deciding whether to waive the ordinary process for designating the record on appeal, and it did not abuse its discretion in declining to do so.[5]

The State has never explained why it failed to timely raise the issue of the allegedly inadequate record. It notes that "preparing a transcript . . . is costly in both time and budget, and it is not the State's burden." Suppl. Br. of Pet'r at 17. The State also "believed Molnar's short brief to be plainly without merit" and expected the Court of Appeals to order supplementation of the record if it thought otherwise. Pet. for Review at 19. These assertions may explain why the State did not arrange to file the transcript using its own resources. But they do not explain why the State never suggested that the appellate record was insufficient until after the Court of Appeals decided in Molnar's favor.

Both parties designated portions of the record on appeal and neither party indicated that anything notable happened at Molnar's sentencing hearing. Given this lack of notice from the parties, the Court of Appeals was not obligated to raise concerns about the lack of a sentencing transcript sua sponte. And in fact, the transcript is not necessary. As the analysis above shows, the Court of Appeals

---

[5] The State has not filed a motion to supplement the record in this court, so we have no occasion to exercise our own discretion in the first instance.

*State v. Molnar*, No. 98864-1

erred on the merits, but the correct decision can be reached based solely on the timely designated record.

CONCLUSION

When evaluating a claim that the State breached a plea agreement by undercutting its own sentencing recommendation, courts must consider the specific conduct that the defendant points to and evaluate that conduct in the specific context presented. Based on the context presented here, we reverse the Court of Appeals and reinstate the sentencing court's ruling denying Molnar's motion for resentencing. In addition, as demonstrated by this case, we must reiterate how important it is for superior courts to process motions for postconviction relief in accordance with CrR 7.8(c).

*State v. Molnar*, No. 98864-1



Yu, J.

WE CONCUR:

González, C.J.

Stephens, J.

Johnson, J.

Gordon McCloud, J.

Montoya-Lewis, J.

Owens, J.

Whitener, J.

*State v. Molnar (Laszlo)*

No. 98864-1

MADSEN, J. (concurring)—I agree with the majority in result: deny Laszlo Molnar's postjudgment motion and reinstate his original sentence of 90 months. I write separately because the majority reaches the merits of this case while I would resolve it on procedural grounds: this collateral attack on the judgment is untimely and the record is inadequate for review.

RCW 10.73.090(1) precludes collateral attacks on a criminal judgment and sentence filed more than one year after that judgment becomes final, provided it is facially valid and rendered by a court of competent jurisdiction. The one-year statutory deadline is "written in mandatory terms and is a constitutionally valid means of controlling the flow of postconviction collateral relief petitions." *State v. Schwab*, 141 Wn. App. 85, 90, 167 P.3d 1225 (2007) (citing *Shumway v. Payne*, 136 Wn.2d 383, 399, 964 P.2d 349 (1998)). In limited instances, exceptions have been made to the general rule that the courts do not consider collateral attacks after the one-year time bar. *E.g.*, *In re Pers. Restraint of Davis*, 188 Wn.2d 356, 362 & n.2, 395 P.3d 998 (2017) (granting a timely filed motion for extension of time past RCW 10.73.090 pursuant to this court's

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

inherent authority). This is not such an instance. Here there is no question that Molnar's motion for resentencing was filed more than a year after his judgment finalized; no party sought to extend the statutory deadline or to argue that the deadline is inapplicable or could be overcome. Indeed, no one involved in the case recognized that RCW 10.73.090 was triggered until amicus curiae pointed it out in a brief in this court.

Based on the "exceptional circumstances" of the case, the majority reverses not on untimeliness but on the underlying issue—that the State did not breach the plea agreement. Majority at 12-24. The majority does so without the assistance of a complete record. I would decline to reach the merits of Molnar's claim.

In analyzing plea agreements, courts determine whether the State violated its duty to adhere to that agreement by reviewing "the *entire* sentencing record and applying an objective standard." *State v. Xaviar*, 117 Wn. App. 196, 199-200, 69 P.3d 901 (2003) (emphasis added) (citing *State v. Williams*, 103 Wn. App. 231, 236, 11 P.3d 878 (2000)). Plea agreements are contracts. *State v. Sledge*, 133 Wn.2d 828, 838-39, 947 P.2d 1199 (1997) (quoting *State v. Mollichi*, 132 Wn.2d 80, 90, 936 P.2d 408 (1997)). To determine the meaning of contract language, courts apply the "context rule." *Berg v. Hudesman*, 115 Wn.2d 657, 666-69, 801 P.2d 222 (1990). The rule allows examination of the context surrounding a contract's execution, including extrinsic evidence to assist in determining the parties' intent. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 502, 115 P.3d 262 (2005). We do not have the full record, including the verbatim report of proceedings, in this case nor did the Court of Appeals. Neither this court nor

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 98864-1
Madsen, J., concurring

the Court of Appeals was in a position to examine the State's behavior at sentencing to fully consider whether it acted in accordance of or in breach of the plea agreement. Absent a complete record, I would decline to address the merits of the alleged breach.

Considering the messy procedural posture of this case, the inadequate appellate record, and the simple fact that Molnar's postjudgment motion was untimely, I would reverse the Court of Appeals on procedural grounds.

Accordingly, I concur in the majority.

_____
Madsen, J.

3